Apex Health, Inc. v. Atrium Health, Inc., 2026 NCBC 10.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV023655-590

APEX HEALTH, INC., APEX
MANAGEMENT SOLUTIONS, LLC,
J.B. COTTON & COMPANY, LLC, and
APEX HOLDINGS, INC.

Plaintiffs,

v.

ATRIUM HEALTH, INC.,

Defendant.

**ORDER AND OPINION ON
PLAINTIFFS' MOTION FOR LEAVE
TO FILE FIRST AMENDED
COMPLAINT**

1.     **THIS MATTER** is before the Court on Plaintiffs' Motion for Leave to File First Amended Complaint pursuant to Rule 15(a) of the North Carolina Rules of Civil Procedure (Motion), (ECF No. 35).

2.     Plaintiffs seek to amend their pleading to add a claim under Chapter 75 of the North Carolina General Statutes for unfair and deceptive trade practices based on information obtained during discovery.  (Pls.' Mot. Leave File First Am. Compl. [Mot. to Am.] 2, ECF No. 35; Mot. to Am., Ex. 1, First Am. Compl. [Proposed Am. Compl.] ¶ 1, ECF No. 35.2.)

3.     Defendant objects to the Motion, arguing that it should be denied for "(i) undue delay and undue prejudice; (ii) bad faith; and (iii) futility of amendment." (Atrium Health, Inc.'s Br. Opp'n Pls.' Mot. Leave File First Am. Compl. [Def.'s Opp'n] 2–3, ECF No. 44.)

4.     The Court, having considered the Motion, the briefs filed in support of and in opposition to the Motion, the arguments of counsel at a hearing held 13 January

2026, and other relevant matters of record, concludes that the Motion shall be **DENIED with prejudice**.

> *McGuireWoods LLP, by Mark Kinghorn and William Hutchinson, for Plaintiffs Apex Health, Inc., Apex Management Solutions, LLC, J.B. Cotton & Company, LLC, and Apex Holdings, Inc.*

> *Bradley Arant Boult Cummings LLP, by Jonathan Schulz and Robert Marcus, for Defendant Atrium Health, Inc.*

Earp, Judge.

## I. FACTUAL BACKGROUND

5. The following is a summary of Plaintiffs' allegations that are relevant to the Motion before the Court.

6. J.B. Cotton & Company, LLC (J.B. Cotton) is a Michigan limited liability company that was formed to fund Apex Health, Inc. (Proposed Am. Compl. ¶ 7.)

7. Apex Holdings, Inc. is a Michigan corporation that is a wholly owned subsidiary of J.B. Cotton. (Proposed Am. Compl. ¶ 8.)

8. Apex Health, Inc. is a North Carolina corporation and a wholly owned subsidiary of Apex Holdings, Inc. Apex Health, Inc. was authorized to offer Medicare Advantage (MA) health plans in North Carolina and South Carolina in 2022 and 2023 pursuant to a contract with the Centers for Medicare and Medicaid Services. (Proposed Am. Compl. ¶ 9.)

9. Apex Management Solutions, LLC is a Michigan limited liability company that was formed by J.B. Cotton to provide administrative and technical services to Apex Health, Inc. (Proposed Am. Compl. ¶ 10.)

10. Atrium Health, Inc. (Atrium) is a North Carolina non-profit corporation that operates an integrated healthcare delivery system. (Proposed Am. Compl. ¶¶ 12–13.)

11. Apex[1] was formed in late 2018 for the purpose of offering and operating MA plans in the Southeast. (Proposed Am. Compl. ¶ 17.) Private health insurers, including Apex, offer MA plans as an alternative to "traditional" Medicare and earn a fixed monthly reimbursement for every beneficiary who enrolls in a MA plan. (Proposed Am. Compl. ¶¶ 18–19.)

12. Beneficiaries are almost exclusively enrolled during the Annual Enrollment Period that occurs between October and December, making these months the critical period to ensure as many beneficiaries are enrolled as possible. (Proposed Am. Compl. ¶ 20.)

13. Health insurers often rely on independent brokers to enroll members in their plans. However, brokers charge fees for each enrollment, so it is financially advantageous for insurers to enroll beneficiaries without using independent brokers. (Proposed Am. Compl. ¶ 21.)

14. In November 2020, Atrium decided to offer its own MA plan but, according to Apex, Atrium did not want to bear any risk associated with creating that plan. (Proposed Am. Compl. ¶ 26.) To accomplish this goal, Atrium issued a Request for Information (RFI) seeking a health insurer to shoulder the financial risk of launching

---

[1] "Apex" is used to reference Plaintiffs J.B. Cotton, Apex Holdings, Inc., Apex Health, Inc., and Apex Management Solutions, LLC, collectively, throughout the Opinion.

the plan. (Proposed Am. Compl. ¶ 27.) Apex alleges that Atrium specified that it was looking for a "partner." (Proposed Am. Compl. ¶ 30.)

15.    As a part of the arrangement, Atrium wanted the health insurer to offer a MA plan that included only Atrium healthcare providers. (Proposed Am. Compl. ¶ 28.) This type of arrangement is known as a "narrow network" plan and can be less attractive to consumers, and therefore riskier to offer, because the covered providers are limited. (Proposed Am. Compl. ¶¶ 28, 31, 43.)

16.    Despite the risks associated with a narrow network plan, Apex recognized that a potential partnership with Atrium could be beneficial because Atrium was one of the nation's largest and highest performing healthcare systems. (Proposed Am. Compl. ¶¶ 29–31.)

17.    Therefore, on 3 December 2020, Apex submitted a response to Atrium's RFI, observing that the relationship needed to be "highly collaborative, with both parties' full commitment." (Proposed Am. Compl. ¶ 35.)

18.    Over the next several months, Atrium and Apex engaged in numerous interviews in which Apex continued to make it clear that, for the plan to succeed, it would need Atrium's "complete buy in and support as a true partner." (Proposed Am. Compl. ¶ 36.) According to Apex, Atrium stated that it was fully behind Apex. (Proposed Am. Compl. ¶ 37.) Atrium ultimately selected Apex to establish a narrow network plan. (Proposed Am. Compl. ¶ 38.)

19.    Apex alleges that thereafter, in emails and presentations, Atrium referred to the Plan as "our own MA Product" and to Apex as "the recommended partner for a

co-branded MA Product." (Proposed Am. Compl. ¶¶ 39–40.) Relying on these representations, Apex shifted its resources to fully pursue the opportunity with Atrium. (Proposed Am. Compl. ¶ 41.)

20. Apex alleges that during the selection process, Atrium representatives made repeated statements indicating that they supported a co-branded plan. (Proposed Am. Compl. ¶¶ 37–38, 43.) Among them was an email sent by one of Atrium's representatives, Jennifer Brady, to Apex executives, stating:

> [T]he MA Strategy group made the recommendation to the EVP's and Gene Woods to move forward with ApexHealth as our selected partner to deliver a co-branded Medicare Advantage Plan. They have preliminarily approved our recommendation contingent upon working on the [Letter of Intent] and getting in writing the things that we have agreed upon over the past few weeks.

(Proposed Am. Compl. ¶ 38.)

21. On 10 February 2021, the parties entered into a Letter of Intent (LOI) identifying Apex as Atrium's partner and stating that the parties intended to enter into an "arrangement to form a co-branded, high-performing network Medicare Advantage health plan." (Proposed Am. Compl. ¶ 42.) Apex alleges that it was Atrium that inserted the co-branding language in the final LOI. (Proposed Am. Compl. ¶ 42.)

22. Over the next several months, the parties negotiated the terms of the Health Plan Collaboration and Shared Risk Agreement (Agreement). (Proposed Am. Compl. ¶ 62; Ex. A, Health Plan Collaboration and Shared Risk Agreement [Agreement].) Apex alleges that, despite Atrium's repeated representations,

"Atrium's decision-makers and leadership" never intended to partner with Apex to create and market a co-branded MA plan. (Proposed Am. Compl. ¶ 56.) Instead, Apex contends that, all along, Atrium planned to treat Apex as it did its other MA plan providers, which meant that Apex would not receive any preferential marketing. (Proposed Am. Compl. ¶ 57.)

23. In support of this contention, Apex points to an email sent by Michael Parkerson, Atrium's Chief Marketing and Communications Officer who, according to Apex, was the "ultimate decision maker" with respect to marketing and branding decisions. (Proposed Am. Compl. ¶ 58.) The email was sent to Joan Thomas, Mr. Parkerson's Atrium colleague, in March 2021, approximately two months before the Agreement was finalized. In the email, Mr. Parkerson opined, "I do not believe we should be stating that Apex is 'our' plan or that we are giving them preferential treatment / consideration" and "I believe that need [sic] to be careful about describing APEX as 'our plan' – I think this would be incorrect." (Proposed Am. Compl. ¶¶ 58, 60.) According to Plaintiffs, Atrium representatives did not share the content of these internal communications with it. (Proposed Am. Compl. ¶ 61.)

24. Other communications produced by Atrium in discovery and that are dated before the Agreement was finalized indicate that Atrium recognized the need to define what was meant by "co-branding" the Plan. One such email from Peter Hiltz (whose position is not identified in the proposed pleading) to Atrium representatives Terry Williams and Ms. Brady concluded, "[t]he big items are around co-branding, marketing, and Provider Affiliation(education) [sic] plan - all crucial areas."

(Proposed Am. Compl. ¶ 54.) Another internal Atrium communication dated shortly before the Agreement was finalized broadly characterized the Agreement as being "consistent with the previous letter of intent and previous financial modeling." (Proposed Am. Compl. ¶ 65) (emphasis omitted).

25. On 13 May 2021, Apex and Atrium entered into the Agreement to "offer a Medicare Advantage health plan (the 'Plan') within North Carolina and South Carolina for the 2022 plan year and in subsequent years." (Agreement § 1.1.) Apex executed the Agreement because it believed that it would have Atrium's "full partnership in branding and marketing the Plan." (Proposed Am. Compl. ¶ 67.)

26. In the Agreement, the parties expressed their "desire to collaborate on the Plan as set forth in this Agreement, including sharing certain financial risks of the Plan, coordinating clinical and administrative services in support of the Plan and Plan members, and long-term strategic planning for Plan growth." (Agreement § 1.3.)

27. Apex's duties included "develop[ing] the Plan, including but not limited to providing required risk-based capital and developing [Apex's] Policies and marketing programs." (Agreement § 3.1.) Apex was also "primarily responsible for developing sales and distribution channels to increase Plan membership." (Agreement § 4.5.)

28. Atrium agreed to "use commercially reasonable efforts to support [Apex's] marketing efforts consistent with applicable Law." (Agreement § 2.2.) While the Agreement provides that Atrium "may pursue other Medicare Advantage strategies within the Service Community," it also prohibits Atrium from "enter[ing] into any arrangement similar to the one created by this Agreement within the Service

Community to form an Atrium-branded Medicare Advantage plan without the written consent of [Apex]." (Agreement § 4.8.2.)

29. The parties agreed to establish a Governance Committee consisting of representatives from both Apex and Atrium to "provide general oversight of the Plan," including marketing and sales. (Agreement § 4.1.1.)

30. A merger clause states that the Agreement, "including attachments and any document incorporated by reference, contains the entire agreement between the Parties[.]" (Agreement § 13.4.)

31. Apex believed the Agreement reflected Atrium's commitment to partner with it to co-brand the Plan. (Proposed Am. Compl. ¶¶ 74, 76.) However, Apex admits that "[p]rovider co-branding and marketing can take many forms[,]" (Proposed Am. Compl. ¶ 49), and neither the word "co-brand" nor specific co-branding expectations are included in the Agreement.

32. After the Agreement was executed, Apex alleges that it worked diligently to fulfill its obligations by designing the Plan, creating a marketing strategy, hiring more staff and vendors, increasing its marketing budget, and expanding its relationship with Media Logic, a marketing firm. (Proposed Am. Compl. ¶¶ 78–79.)

33. Apex further alleges that Atrium delayed and undermined Apex's efforts to market the Plan. (Proposed Am. Compl. ¶ 81.) Apex asserts that it attempted "through commercially reasonable efforts" to co-brand and market the Plan, but that Atrium "thwarted Apex's efforts to present a product to consumers that was supported by and in partnership with Atrium." (Proposed Am. Compl. ¶¶ 81–86.)

34. Apex maintains that Atrium refused efforts to co-brand and market the Plan in other ways, including (1) on-site promotions in medical offices controlled by Atrium; (2) co-developing a referral program for the Plan; (3) educational opportunities for Atrium's employees and doctors; (4) meeting with Media Logic to assist with the development of more effective marketing strategies; (5) use of certain email and website platforms; and (6) participation in Atrium's health fairs and other customer-facing healthcare events to provide information to potential Plan members. (Proposed Am. Compl. ¶¶ 88, 92.)

35. Apex asserts that during this time it received "mixed messages" from Atrium personnel, "who never seemed aligned[,]" and that "it appeared some Atrium executives were on board with branding and marketing the Plan and appreciated what was needed to be successful," while others, including Mr. Parkerson, "were thwarting their efforts." (Proposed Am. Compl. ¶¶ 81, 96.) Apex alleges that it was not until discovery produced the communications it now references that it understood that Atrium never intended to fulfill its obligations under the Agreement. (Proposed Am. Compl. ¶ 100.)

36. For example, an email produced by Atrium in discovery disclosed that when asked about use of the term "co-branded," one Atrium employee responded, "we are not doing co-branded communications. We are allowing APEX to use our brand to refer to us being part of the network." (Proposed Am. Compl. ¶ 102.)

37. Apex alleges that Atrium did not want to tie itself too closely to Apex because it did not want to upset its relationship with other insurance payers.

(Proposed Am. Compl. ¶ 98.) According to Apex, Atrium's goal was to maximize its profits. (Proposed Am. Compl. ¶ 104.) Atrium also worried about misleading the public by preferentially promoting the Plan. One Atrium employee warned, "I'd want to understand if this is the most attractive plan for [Atrium] patients to join (for [Atrium's] benefit) or if we'd want to be more broad [sic] in sharing all the options that people could remain in." (Proposed Am. Compl. ¶ 105.)

38. In 2021, Apex was able to enroll fewer than 50 beneficiaries for the 2022 plan year. (Proposed Am. Compl. ¶ 107.) The next year Apex increased its marketing budget, brought on additional vendors, and sought alternative means of advertising in an attempt to improve enrollment. Apex significantly increased its partnerships with brokers, which increased its costs. It also focused on convincing Atrium "to meaningfully partner" with Apex. (Proposed Am. Compl. ¶¶ 109–11.)

39. In July 2022, Rae Bush, Atrium's Assistant Vice President of Marketing, told Apex that she was working to feature Apex as the "preferred/highlighted carrier in [Atrium] markets on [its] webpages." (Proposed Am. Compl. ¶ 114.) Consequently, Apex believed that Atrium was ready to engage in a "course correction." (Proposed Am. Compl. ¶ 112.) However, Apex later discovered that the Plan was not given preferential treatment but was listed alphabetically along with other MA plans on Atrium's website. (Proposed Am. Compl. ¶ 115.)

40. Differences within Atrium on this issue continued. According to an October 2022 email from Ms. Bush to Mr. Parkerson, both Mr. Williams and Ms. Brady questioned why the Apex plan was not being featured as a "preferred plan."

(Proposed Am. Compl. ¶ 116.)  Ms. Bush commented to Mr. Parkerson, "I don't care which plan is selected, [Atrium] is in network with them all (mostly)."  (Proposed Am. Compl. ¶ 116.)

41.    Additionally, prior to the 2022 annual enrollment period, Apex became aware that Atrium was merging with Advocate Aurora, and that Advocate Aurora promoted its MA plan using many of the marketing strategies that were allegedly agreed upon under the Plan, including co-branding.  (Proposed Am. Compl. ¶ 117.)  When this information was brought to Atrium's attention, Atrium's reaction to using those strategies with Apex was initially positive, but Atrium eventually refused.  (Proposed Am. Compl. ¶ 118.)

42.    Atrium allegedly refused to co-brand or market the Plan again in 2022, and the Plan enrolled fewer than 150 beneficiaries for the 2023 plan year.  (Proposed Am. Compl. ¶¶ 119–21.)

43.    Given the lack of success in 2021 and 2022, Apex was no longer able to sustain the Plan.  The Plan's failure cost Apex approximately $62 million.  (Proposed Am. Compl. ¶ 124.)

## II.    PROCEDURAL BACKGROUND

44.    Plaintiffs commenced this action on 23 May 2024.  The Complaint included a single claim against Atrium for breach of contract.  (*See generally* Compl., ECF No. 3.)

45. The Case Management Order entered 30 August 2024 allowed for fact discovery until 14 April 2025 and for expert witness discovery until 13 August 2025. (Case Management Order [CMO], ECF No. 13.)

46. On 20 February 2025, the parties jointly moved for an extension of the discovery deadlines. (ECF No. 19.) The Court allowed the motion and amended the CMO to extend the deadline for fact discovery to 14 July 2025 and for expert witness discovery to 12 November 2025. (ECF No. 21.)

47. The parties requested a second extension of the discovery deadlines on 13 June 2025. (ECF No. 22.) The Court again granted the extension and adjusted the deadline for fact discovery to 13 October 2025, and the deadline for expert witness discovery to 24 February 2026. (ECF No. 24.)

48. On 9 October 2025, the parties jointly requested a third extension of the discovery deadlines. (ECF No. 29.) The Court granted the extension for fact discovery to 2 February 2026 and for expert witness discovery to 17 June 2026. (ECF No. 31.) The parties were warned that further extensions would require a heightened showing of good cause. (*See* ECF Nos. 24, 31.)

49. Plaintiffs filed the present Motion on 6 November 2025 requesting to add a claim for unfair and deceptive trade practices (UDTPA). (ECF No. 35.)

50. After full briefing, the Court held a hearing on the Motion on 13 January 2026. (Notice Hr'g, ECF No. 50.) All parties were present and represented by counsel. The Motion is now ripe for disposition.

## III. LEGAL STANDARD

51. After a responsive pleading has been served, a party may amend his pleading only by leave of court or by written consent of the adverse party. N.C. R. Civ. P. 15(a). "[L]eave shall be freely given when justice so requires." *Id.*

52. Even so, "the right to amend is not unfettered." *Howard v. IOMAXIS, LLC*, 2023 NCBC LEXIS 159, at *13 (N.C. Super. Ct. Nov. 29, 2023). "Reasons justifying denial of an amendment include: (1) undue delay, (2) bad faith, (3) undue prejudice, (4) futility of amendment, and (5) repeated failure to cure defects by previous amendments." *Window World of St. Louis, Inc. v. Window World, Inc.,* 2015 NCBC LEXIS 79, at *18 (N.C. Super. Ct. Aug. 10, 2015) (citing *Martin v. Hare*, 78 N.C. App. 358, 361 (1985)).

53. Whether to grant "leave to amend is addressed to the sound discretion of the trial judge[.]" *Chicopee, Inc. v. Sims Metal Works, Inc.*, 98 N.C. App. 423, 430 (1990) (citation omitted).

## IV. ANALYSIS

54. Plaintiffs seek to amend their complaint to add a UDTPA claim. (Proposed Am. Compl. ¶¶ 132–38.) Defendant argues that the Motion should be denied for "(i) undue delay and undue prejudice; (ii) bad faith; and (iii) futility of amendment." (Def.'s Opp'n 2–3.) The Court first addresses futility.

### A. Futility

55. The standard under Rule 15 for futility is essentially the same standard used in reviewing a motion to dismiss under Rule 12(b)(6), but it "provides the Court

liberal discretion to find that an amendment lacks futility." *Simply the Best Movers, LLC v. Marrins' Moving Sys.*, 2016 NCBC LEXIS 28, at \*5–6 (N.C. Super. Ct. Apr. 6, 2016) (citation omitted). "[A] motion to amend is not futile when 'the allegations of the [amendment], treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not.' " *IOMAXIS*, 2023 NCBC LEXIS 159, at \*15 (quoting *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987)).

56. However, "[a] motion for leave to amend is futile and appropriately denied when the 'proposed amendment could not withstand a motion to dismiss for failure to state a claim.' " *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2016 NCBC LEXIS 77, at \*6 (N.C. Super. Ct. Oct. 7, 2016) (quoting *Smith v. McRary*, 306 N.C. 664, 671 (1982)). Dismissal under Rule 12(b)(6) "is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)).

57. When evaluating a claim, the Court views the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (quoting *Kirby v. N.C. DOT*, 368 N.C. 847, 852 (2016) (citation omitted)). The Court examines "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be

granted under some legal theory." *Corwin*, 371 N.C. at 615 (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51 (2016)). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Izydore v. Alade*, 242 N.C. App. 434, 438 (2015) (quoting *Strickland v. Hedrick*, 194 N.C. App. 1, 20 (2008)).

58. Atrium first argues that Apex's proposed UDTPA claim is futile because it is really a flawed claim for fraudulent inducement to enter a contract. (Def.'s Opp'n 13.) Atrium contends that Apex's allegations that Atrium promised "to create a co-branded MA plan" without intending to keep this promise is based on language in an LOI, not a contract, and therefore cannot form the basis of a claim for fraudulent inducement as a matter of law. (Def.'s Opp'n 14–15.)

59. Atrium further argues that Apex's allegations fail to establish a UDTPA claim because Apex has not alleged "egregious or aggravating circumstances" beyond a mere breach of contract. (Def.'s Opp'n 15–18.) Atrium contends that its use of the term "co-brand" in communications with Apex regarding the Plan is not egregious. Rather, Atrium argues, given the sophistication of the parties, Atrium's communications are, at most, "evidence of the parties' differing readings of the Agreement's reference to 'co-develop a brand.'" (Def.'s Opp'n 16–17.)

60. Apex responds that it is not asking the Court to permit it to add a claim for fraudulent inducement, and the proposed UDTPA claim does not require that it allege the elements of fraud. (Reply Mem. Pls.' Mot. Leave File First Am. Compl. [Pls.' Reply Mem.] 11, ECF No. 48.) Instead, Apex maintains that Atrium engaged in a pattern

of deception before, during, and after executing the Agreement by using terms like "co-branded" while failing to reveal that some of its executives, namely its marketing professionals, did not believe that they should promote the Plan as Atrium's own. (Pls.' Reply Mem. 12–13.)

61. To state a UDTPA claim under N.C.G.S. § 75-1.1 *et seq.*, a complainant must allege "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 593 (2005) (quoting *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 460–61 (1991)); *see also* N.C.G.S. § 75-1.1. "[F]ailure to allege a necessary element defeats [a] claim for unfair and deceptive trade practices." *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 42 (2006) (citation omitted).

62. A UDTPA claim is "not intended to apply to all wrongs in a business setting." *Post v. Avita Drugs, LLC*, 2017 NCBC LEXIS 95, at *8 (N.C. Super. Ct. Oct. 11, 2017) (citation omitted). Relevant here, "piggybacking" a UDTPA claim in a breach of contract action is "disfavored by North Carolina and federal courts alike." *Id.* at *9; *see Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62 (1992) ("[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." (citing *Mosely & Mosely Builders, Inc. v. Landin, Ltd.*, 97 N.C. App. 511, 518 (1990))); *Alamance Fam. Prac., P.A. v. Lindley*, 2018 NCBC LEXIS 83, at *26–27 (N.C. Super. Ct. Aug. 14, 2018) (dismissing a UDTPA claim in which the UDTPA and breach of contract claims were based on the

same allegations); *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 347 (4th Cir. 1998) (holding the trial court erred in allowing a UDTPA claim "[g]iven the contractual center of this dispute").

63.     If a UDTPA claim involves a contract, the plaintiff must allege and prove egregious or substantial aggravating circumstances to state a claim.  *See Dalton v. Camp*, 353 N.C. 647, 657 (2001); *Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 196 (2014); *Branch Banking & Tr. Co.*, 107 N.C. App. at 62.  This is true regardless of whether the claim involves the formation of the contract or its breach. *Implus Footcare, LLC v. Vore*, 2025 NCBC LEXIS 121, at *56 (N.C. Super. Ct. Sep. 11, 2025) ("As a general proposition, unfairness or deception either in the formation of the contract or in the circumstances of its breach may establish the existence of substantial aggravating circumstances[.]" (citation omitted)).

64.     "A broken promise, standing alone, is not enough to establish a UDTP[A] claim, unless the evidence shows the promisor 'intended to break its promise at the time that it made the promise.'"  *Hills Mach. Co., LLC v. Pea Creek Mine, LLC*, 265 N.C. App. 408, 421 (2019) (quoting *Wells Fargo Bank, N.A.*, 238 N.C. App. at 196). *See Post*, 2017 NCBC LEXIS 95, at *9–10 ("A section 75-1.1 claim may not be based on the 'existence of an agreement, the terms contained in the agreement, and the interpretation of an agreement.'" (quoting *Broussard,* 155 F.3d at 347)); *Lendingtree, LLC v. Intercontinental Cap. Grp., Inc.*, 2017 NCBC LEXIS 54, at *8 (N.C. Super. Ct. June 23, 2017) ("Aggravating circumstances generally involve forged documents, lies, and fraudulent inducements." (citations and internal quotations omitted)).

65. At bottom, "[t]he determination as to whether an act is unfair or deceptive is a question of law for the court." *Dalton*, 353 N.C. at 656.

66. Here, Plaintiffs focus on the division of opinion within Atrium that they allege existed with respect to the marketing strategy for the Plan. They include portions of documents in which one Atrium executive with whom they were communicating (Ms. Brady) used terms like "co-brand" and referred to the Plan as Atrium's "own." At the same time, Plaintiffs contend that Atrium knew that Atrium's "ultimate decision maker" for marketing, Mr. Parkerson, disapproved of any strategy that would give the Plan a preferential marketing status but did not share this information with Apex during contract negotiations. Atrium's misrepresentations and omissions, Plaintiffs allege, induced Apex into providing a narrow plan that included only Atrium providers, one that it otherwise would not have offered.

67. Unlike the LOI,[2] the Agreement itself does not include the word "co-brand," refer to the Plan as Atrium's "own," or include any specifics regarding how the Plan would be marketed, other than that Atrium would "use commercially reasonable

---

[2] The LOI excerpt, provided by Plaintiffs and dated 10 February 2021, refers to Apex as Atrium's "partner" and to the proposed MA plan as a "co-branded, high-performing network Medicare Advantage health plan[.]" (Proposed Am. Compl. ¶ 42.) The parties admit that the LOI was nonbinding. *See Value Health Sols. v. Pharm. Rsch. Assocs.*, 2021 NCBC LEXIS 37, at *63 (N.C. Super. Ct. Apr. 5, 2021) ("Under North Carolina law, letters of intent that are expressly non-binding and contemplate a more detailed future agreement between the parties are not binding agreements."); *Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at *10 (N.C. Super. Ct. Dec. 12, 2016) ("The Court concludes that the Letter of Intent does not contain language within its four corners to give rise to a binding contract. The Letter's explicit terms provide that it is not a document intended to bind the parties to future action."); *Insight Health Corp.*, 2016 NCBC LEXIS 77, at *11 ("Generally, letters of intent are found to be unenforceable agreements to agree when relied upon to enforce the contemplated transaction.") (citation omitted).

efforts to support [Apex's] marketing efforts consistent with applicable Law." (Agreement § 2.2.)

68. The Agreement does, however, include a merger clause stating that the "Agreement, including attachments and any document incorporated by reference" – which do not include the communications referenced in the Proposed Amended Complaint – "contains the entire agreement between the [p]arties[.]" (Agreement § 13.4.)

69. If Apex thought the marketing arrangement to be of paramount importance, as Plaintiffs allege, one wonders why it was left to chance. This is especially true because, as Plaintiffs allege, "[p]rovider co-branding and marketing can take many forms." (Proposed Am. Compl. ¶ 49.) Given its sophistication and experience in the industry, Apex could have done more to set out its expectations regarding "co-branding" and "partnership" in the Agreement. Its failure to do so may not serve as the basis for a UDTPA claim.[3]

70. Even if the contract included an express provision to co-brand the Plan in the manner Apex claims was contemplated, Apex's allegations regarding Atrium's "pattern of deception" fall short of the egregious or aggravating circumstances required to state a UDTPA claim. At best, Plaintiffs allege that discovery has revealed that (a) Atrium executives were not of one mind regarding whether to support co-branding the Plan, and (b) some of them may have used the term "co-

---

[3] In so holding, the Court does not forecast any determination with respect to Plaintiffs' claim for breach of contract resulting from Atrium's alleged failure to "use commercially reasonable efforts to support [Apex's] marketing efforts consistent with applicable Law." (Agreement § 2.2.)

brand" loosely without defining it and/or referred to the narrow network Plan as Atrium's "own." Plaintiffs have not alleged that the Atrium executives it names in the Proposed Amended Complaint acted uniformly, and with a collective desire, to induce Plaintiffs to enter the Agreement without intending to fulfill Atrium's obligations at the time the parties entered the Agreement.[4] *See Martin Commc'ns, LLC v. Flowers,* 2021 NCBC LEXIS 30, at *13–14 (N.C. Super. Ct. Mar. 31, 2021) ("Plaintiff must also allege facts from which the Court may reasonably infer that Defendants never intended to carry out their representations when they were made, . . . which Plaintiff has failed to do."); *cf. Hoyle v. Bagby,* 253 N.C. 778, 781 (1961) ("[T]o be fraudulent the intent not to pay must have existed in the defendant's mind at the time he made the promise which induced the plaintiff to do the work."); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *9 (N.C. Super. Ct. Mar. 27, 2018) (To state a claim based on a promise of future intent, the plaintiff must allege facts "from which a court and jury may reasonably infer that the defendant did not intend to carry out such representations when they were made." (citation omitted)).

71. While maintaining that it does not seek to amend to add a claim for fraud, Apex relies on allegations sounding in fraudulent inducement to allege that Atrium has done more than just breach a contract. Throughout the Proposed Amended Complaint, Plaintiffs allege that Atrium deceived Apex into agreeing to the terms of

---

[4] While Plaintiffs allege that Mr. Parkerson was the "ultimate decision maker on branding and marketing," (Proposed Am. Compl. ¶ 58), they do not allege that (a) Mr. Parkerson had the authority to override contract terms and (b) Ms. Brady and/or Mr. Williams, or any other Atrium executives involved in the negotiations with Apex, were aware of that ability. The Court notes that Mr. Williams, not Mr. Parkerson, executed the Agreement on behalf of Atrium. (*See generally* Agreement).

the Agreement without ever intending to give the Plan preferential marketing treatment. (*See* Proposed Am. Compl. ¶¶ 4, 56, 68, 100, 106, 133.) Thus, the proposed UDTPA claim must be pled with particularity. N.C. R. Civ. P. 9(b) ("In all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."); *Botanisol Holdings II, LLC v. Propheter*, 2021 NCBC LEXIS 94, at *24–25 (N.C. Super. Ct. Oct. 18, 2021) ("With respect to the Rule 9(b) standard, because the Chapter 75 claim is premised on deceptive conduct, the heightened pleading standard of Rule 9(b) applies."); *cf. Value Health Sols., Inc.,* 2019 NCBC LEXIS 70, at *27 ("In pleading actual fraud, the particularity requirement is met by alleging time, place, and content of the fraudulent representation*, identity of the person making the representation* and what was obtained as a result of the fraudulent acts or representations." (quoting *Terry v. Terry,* 302 N.C. 77, 85 (1981) (emphasis added))); *Hale v. MacLeod*, 294 N.C. App. 318, 329 (2024) ("We further note Rule 9 . . . requires a plaintiff to plead the *'identity of the person making the representation'* and that the 'particularity required cannot be satisfied by using conclusory language[.]' " (citation omitted) (emphasis added)).

72.     Plaintiffs' proposed amendment to its pleading fails in this regard. While it includes snippets of emails and other documents upon which Plaintiffs rely, Plaintiffs allege only that "Atrium" induced it to enter the Agreement and never identified who from Atrium either (a) had a duty to speak and concealed material facts[5] or (b) made material misrepresentations. This failure dooms their claim.

---

[5] *See RREF BB Acquisitions, LLC v. MAS Props., L.L.C.*, 2015 NCBC LEXIS 61, at *28 (N.C. Super. Ct. June 9, 2015) (absent exception, no duty to disclose generally exists in transactions

**B. Undue Delay, Undue Prejudice, and Bad Faith**

73.     Defendant argues that Plaintiffs unduly delayed in seeking an amendment because Plaintiffs had access to the documents that formed the basis of the UDTPA claim for more than six months before filing the Motion.  (Def.'s Opp'n 7–8.)  In addition, Defendant contends it would be unduly prejudiced by the addition of a UDTPA claim at this point in the litigation because, among other things, the possibility of treble damages and attorneys' fees changes the nature of the litigation with "less than two months to take discovery[.]"[6]  (Def.'s Opp'n 11.)  Lastly, Defendant argues that Plaintiffs filed the motion in bad faith on the eve of mediation.  (Def.'s Opp'n 12.)

74.     Plaintiffs respond that the proposed amendment is offered in good faith, that they did not unduly delay filing the motion to amend because they are still engaged in discovery, and that no prejudice would result from adding a UDTPA claim because discovery is ongoing, and no trial date has been set.  (Mot. to Am. 6.)

75.     Denial of an amendment based on undue delay and undue prejudice is appropriate when "a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay."  *Alkemal Sing. PTE Ltd. v. DEW Glob. Fin., LLC*, 2017

---

between sophisticated businessmen experienced in such transactions (citing *B & F Slosman v. Sonopress, Inc.*, 148 N.C. App. 81, 87 (2001))).  In this case, Plaintiffs do not even identify who was at the negotiating table.

[6] The Court notes that it extended the discovery period on three occasions, (*see* ECF Nos. 21, 24, 31), and warned the parties on two of those occasions that "[f]urther extensions of the discovery deadlines in this matter shall require a heightened showing of good cause[.]"  (ECF Nos. 24, 31).

NCBE LEXIS 112, at *26–27 (N.C. Super. Ct. Dec. 12, 2017) (citation omitted). Additionally, "the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit." *Implus*, 2025 NCBC LEXIS 121, at *24 (citation omitted).

76. As for undue prejudice, "[t]he burden is upon the party objecting to the amendment to set forth the grounds for his objection and to establish that he will be prejudiced if the motion is allowed." *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 30, at *9–10 (N.C. Super. Ct. Apr. 6, 2018) (citations omitted).

77. The Court may disallow amendments on grounds of bad faith when the amendments are "abusive or made in order to secure some ulterior tactical advantage." *Columbus Life Ins. Co. v. Wells Fargo Bank, N.A.*, 2022 NCBC LEXIS 40, at *11 (N.C. Super. Ct. May 3, 2022) (quoting *Vitaform, Inc. v. Aeroflow, Inc.*, 2021 NCBC LEXIS 79, at *16 (N.C. Super. Ct. Sep. 16, 2021)). Denial of an amendment based on bad faith requires a party opposing the amendment to offer evidence that the moving party "is driven by an improper motive or purpose, is abusive, or is otherwise offered in bad faith." *Vitaform*, 2021 NCBC LEXIS 79, at *15.

78. The Court is not persuaded by Atrium's arguments that Apex has sought an amendment in bad faith. However, Apex's delay in bringing its Motion for months after discovery revealed the documents on which it relies is problematic. This case has been pending since 23 May 2024. It was up to Apex to use the discovery period efficiently and bring any delay or other obstruction by Atrium to the Court's attention. It did not. Instead, it joined with Atrium in requesting three extensions

of the discovery period – all of which were afforded by the Court. Apparently, both sides have back-end loaded their discovery efforts. They did not bring any disputes regarding delays in document production or deposition scheduling to the Court's attention. They managed the (extended) discovery period in this manner at their own peril.

79. Fact discovery closed on 2 February 2026. The Court agrees with Atrium that, under the circumstances, Apex's Motion simply comes too late in the process to afford Apex a second bite at the apple by allowing a dismissal without prejudice.[7]

## V. CONCLUSION

80. **WHEREFORE**, the Court, in its discretion, **ORDERS** that Plaintiffs' Motion to Amend is **DENIED with prejudice**.

**IT IS SO ORDERED**, this the 11th day of February, 2026.

/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
  for Complex Business Cases

---

[7] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013).